**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Jose Miguel Hilario

    v.                         Civil No. 14-cv-193-JL
                                      Opinion No. 2014 DNH 184

Esker L. Tatum, Jr.[1]


# O R D E R


Before the Court is Defendant's Motion (doc. no. 11) to rescind this Court's May 7, 2014 Order (doc. no. 4).  The Order directed Defendants not to place the Plaintiff, Jose Miguel Hilario, into "general population" at the Federal Correctional Institute, Berlin, New Hampshire ("FCI Berlin"), where Hilario is presently incarcerated, and to house Hilario, to the extent practicable, in a manner that will keep him safe from harm.  The Court held an evidentiary hearing on August 11, 2014, on the Motion to rescind and on Hilario's request that the Court maintain the May 7 Order.  Also before the Court are a number of motions filed by Hilario (doc. nos. 22, 24, 32, and 41) and Defendants' Motion to Dismiss (doc. no. 37).

---

[1]The defendants in this action, who are all sued in their official capacities, are Federal Correctional Institution, Berlin, New Hampshire employees Warden Esker Tatum, Lt. Jeremy Hess, and Lt. Howard Andy.

BACKGROUND[2]

I.    **Plaintiff's Evidence**

A.    April 3 and 4, 2014

At the August 11 hearing, Hilario testified that he arrived at the FCI Berlin on April 3, 2014.  Hilario testified that, at the time of his arrival, he believed that the inmates with whom he had been transported to FCI Berlin, and who were subsequently housed with Hilario at the FCI Berlin, were circulating rumors about Hilario being a sex offender.[3]  Upon his arrival at FCI Berlin, Hilario expressed concern to FCI Berlin staff that he be housed where it would be safe for him as a sex offender. Shortly thereafter, at about 8:45 p.m., Hilario was placed on "C-1 Unit," in general population.

Hilario's cellmate on C-1 Unit on April 3, 2014 ("Cellmate 1"), immediately asked Hilario about his incarcerating offense. Hilario eventually told Cellmate 1 that he was a sex offender. Cellmate 1 told Hilario that he could not stay on the unit unless he could produce court papers to demonstrate that he was

---

[2]For purposes of resolving the Plaintiff's request for an injunction, and the Defendants' Motion to Rescind (doc. no. 11), the Court considers the testimony, argument, and exhibits presented at the August 11, 2014, hearing in this matter.

[3]Hilario is incarcerated pursuant to his convictions for possession and distributing child pornography.  See United States v. Hilario, 1:08CR00079-01ML (D.R.I.); see also Defs' Ex. 1.

not a sex offender within a month.  The following morning, Hilario reported Cellmate 1's statement, which Hilario understood to be a threat, to the C-1 Unit officer.  Hilario was immediately transferred to the Special Housing Unit ("SHU") while the threat was investigated.

On April 9, 2014, FCI Berlin authorities met with Hilario and informed him that they could not verify a threat to Hilario on C-1 Unit.  Warden Esker Tatum directed that Hilario be returned to C-1 Unit.  On April 13, 2014, the eve of Hilario's return to C-1 Unit, Hilario filed an "Inmate Request to Staff" form, directed to Tatum, stating that he had actually been assaulted by Cellmate 1 on April 3, 2014, but had not previously reported the assault because he was afraid for his safety in the institution if he was identified as a "snitch."

### B.   April 14, 2014

Hilario was returned to C-1 Unit on April 14, 2014. Hilario states that in his C-1 Unit cell, his cellmate, a different individual than his cellmate on April 3, 2014 ("Cellmate 2"), stated that Hilario could not stay in that cell, and punched Hilario on the left side of his face.  Hilario said that he was in his cell for a short time, approximately three to five minutes.

When Hilario left his cell, he went to the C-1 Unit office and told the corrections officer there that he wanted to see a lieutenant.  Hilario was sent to Lt. Jeremy Hess's office. Hilario told Lt. Hess that he needed protective custody, and began to explain what had just occurred in his cell, but Lt. Hess told Hilario instead to fill out a "Protective Custody" form.  Lt. Hess placed Hilario in the "tank" to fill out the form, but two to three minutes later, before Hilario had a chance to complete the form, and before he had written down that he was assaulted, Lt. Hess snatched the form out of Hilario's hands and told Hilario that he was not going to send him to protective custody.

A corrections officer then directed Hilario to return to his cell on C-1 Unit.  Hilario refused, stating that he feared his life was in jeopardy on that unit.  Accordingly, Hilario was transferred to SHU and issued a disciplinary incident report for the refusal.  Hilario testified that later, upon Hilario's report that he had been assaulted by Cellmate 2, he was seen and medically assessed by FCI Berlin Nurse Christine Larin, who determined that Hilario had an injury on the left side of his face.

FCI Berlin officials determined again that the alleged April 14, 2014, threat and assault were not verified, and that

Hilario should be returned to a general population unit. Hilario has remained at SHU, however, since April 14, 2014, during the investigation of the asserted threat, and, since May 7, 2014, pursuant to the May 7 Order.[4]

## II.   Defendants' Evidence

### A.   April 3 and 4, 2014

On April 3, 2014, Hilario arrived at the FCI Berlin. During an intake interview with Special Investigative Services ("SIS") Technician Glen Brown, Hilario stated that he did not have any known enemies or threats to him at the FCI Berlin. Hilario was then placed on C-1 Unit in general population. On April 4, 2013, Hilario saw Lt. Hess and requested protective custody status on the basis that, as a sex offender, he was not safe in general population, and that inmates had been requesting to see his court papers to determine whether he was a sex offender and therefore should get himself removed from C-1 Unit.

Hilario was immediately removed to SHU during an investigation of the threat alleged.  Brown interviewed Hilario at SHU.  Hilario reported to Brown that, because he was

---

[4]The Court did not intend for the May 7 Order to serve as a specific directive to the Defendants to house Hilario in SHU. At the August 11, 2014, hearing, the Defendants represented to the Court that SHU is the only alternative to general population housing at FCI Berlin.

incarcerated on a sex offense, he had been asked to produce his court papers and harassed, both by Cellmate 1 and by Hilario's fellow Dominican inmates on C-1 Unit.

On April 6, 2014, Brown interviewed both Cellmate 1 and a Dominican inmate in connection with Hilario's allegations.  Both inmates told Brown that they were not involved with checking court papers, that they had no issues with Hilario, and that Hilario could return to C-1 Unit.  Unable to confirm that there was any threat to Hilario's safety, Brown recommended that the alleged threat be deemed unverified, and that Hilario be returned to general population.  After a meeting on April 9, 2014, attended by Hilario, Brown, Warden Tatum, and other FCI Berlin officials, Esker told Hilario that he would be returned to general population.  Hilario was released to C-1 Unit on April 14, 2014.

B.   <u>April 14, 2014</u>

Hilario arrived on the C-1 Unit at 1:35 p.m. on April 14, 2014.  At approximately 2:45 p.m., Hilario went to the C-1 Unit lieutenant's office and reported to Lt. Hess that he had been threatened and that his life was in danger in general population, and requested protective custody status.  Lt. Hess testifed that he spoke with Hilario for 15 - 30 minutes, during which time Hilario gave at least three different accounts of who

had threatened him, first stating it was someone on his unit,
then that it was Cellmate 2, who Hilario described as Hispanic,
and then that it was four to seven of Cellmate 2's friends on
the unit.  When Lt. Hess said that he could watch the video feed
on the unit to help determine who had made the reported threat,
Hilario stated that it was the same person who had assaulted him
on April 3.  Lt. Hess testified that he asked Hilario a number
of times if he had been assaulted on April 14, 2014, and Hilario
never said that he was hit.

Lt. Hess then gave Hilario a form on which to request
protective custody status, placed Hilario in the holding cell in
his office, and told him to fill out the form.  At that time,
among other inconsistencies in Hilario's statements, Lt. Hess
determined that Cellmate 2 was African-American, not Hispanic.
Hess also spoke with the C-1 Unit officer, who had not noticed
anything unusual on the unit.[5]  Hess contacted the SHU and was

---

[5]Although it does not bear on the decision in this Order,
the Court finds it concerning that when FCI Berlin Lt. Derek
Myers testified that the C-1 Unit officer did not notice anyone
threatening or harming Hilario, Lt. Myers added that, as the FCI
Berlin units are large, the officer probably wouldn't have
noticed such behavior anyway.  Under certain circumstances, not
present here, inadequate staffing on a prison housing unit, such
that threat or harm might come to an inmate without being
noticed, and FCI Berlin officials' awareness of that inadequacy,
could constitute evidence of deliberate indifference to a
serious risk to inmate safety.

told that there had been no problems with Hilario's release from SHU to C-1 Unit earlier that day.

Lt. Hess testified that because there was "not a whole lot" of credible information provided by Hilario, he chose not to pursue Hilario's request for protective custody.  Lt. Hess testified that he then snatched the Protective Custody form out of Hilario's hands.[6]  Hess told Hilario that he would not send him to SHU based on his request for protective custody, and further advised Hilario that the only way he could get to SHU at that point was to refuse a direct order to return to general population.  Lt. Hess also told Hilario that such a refusal would result in immediate placement in SHU, and the issuance of a disciplinary report to Hilario for refusing a direct order.  Lt. Hess then told another officer to give Hilario a direct order to return to his housing unit.  The officer twice directed Hilario to return to general population.  Hilario refused the order and was taken to SHU and later issued a disciplinary report.

---

[6]Lt. Hess testified that the form was ultimately shredded, but would have been made part of Hilario's file if the threat alleged had ultimately been verified.  As the Court noted at the hearing, the destruction of a written request for protective custody is not a good investigative or administrative practice, and could be deemed under certain circumstances, although not in this case, as evidence of deliberate indifference to a serious risk to an inmate's safety.

At 3:30 p.m., while Hilario was still in the lieutenant's office on C-1 Unit awaiting transport to SHU, Lt. Derek Myers came on duty and relieved Lt. Hess at the end of his shift.  Lt. Hess told Lt. Myers that Hilario had requested protective custody status, alleging that he had been threatened, and that Hilario was scared to stay in general population.  Lt. Hess also told Lt. Myers that Hilario had refused to return to C-1 Unit and was thus going to be placed at SHU.  Lt. Myers decided to conduct his own investigation of the threat incident, and questioned Hilario briefly before having Hilario escorted to SHU at approximately 3:50 p.m.  Hilario told Lt. Myers that he had been threatened, but did not report being assaulted.  Once Hilario was in SHU, another officer advised Lt. Myers that Hilario had reported being assaulted on C-1 Unit that day.  Lt. Myers then directed that Hilario be medically assessed.  An SIS investigation was initiated.  Lt. Myers reviewed the C-1 Unit video feed from 1:30 p.m. to 2:45 p.m. on April 14, 2014, and saw no evidence of an assault on Hilario.  Lt. Myers stated that the video did not reach into Hilario's cell, but did show Hilario going into his cell twice, for no more than six seconds each time.  Further, Lt. Myers testified that Hilario's demeanor on the unit was calm, and that Hilario had a conversation with Cellmate 2 outside of his cell after leaving his cell for the

second time, and then lingered in the common area for approximately twenty minutes before going to the unit office to request protective custody status.

Lt. Myers and Lt. Hess both testified that in their dealings with Hilario between 1:35 p.m. and approximately 7:00 p.m., they saw nothing in Hilario's appearance to suggest that he had been assaulted.  A medical assessment was conducted by FCI Berlin Nurse Christine Larin during the evening of April 14, 2014.  Nurse Larin's report indicates that Hilario reported being punched in the left cheek, that Hilario had "slight redness to [his] left upper cheek" and "some tenderness on palpation," but no "raccoon eyes, laceration(s), abrasion(s), [or] swelling."

On April 24, 2014, Brown interviewed Hilario concerning his second protective custody request.  Brown also interviewed other inmates, including Cellmate 2, who stated that they had not assaulted or threatened Hilario, and had no issue with him. Brown also viewed the C-1 Unit video feed from approximately 1:50 to 3:50 p.m., and did not see any evidence of an assault on the tape.  Brown conceded that he did not view the video for the first fifteen minutes Hilario spent in C-1 Unit on April 14, 2014, and that the video feed did not provide a view inside Hilario's cell.  Based on his investigation, and the fact that

Hilario had stated he would be willing to be housed in a general population unit if no one there presented any threat to him, Brown recommended that Hilario be released from SHU and returned to general population.

      C.   <u>Sex Offenders at FCI Berlin</u>

Brown testified that, as of the date of the August 11 hearing, there were 86 sex offenders at FCI Berlin.  In addition to Hilario, five other sex offenders were in SHU based on allegations that they had been pressured while in general population to produce their court paperwork.  Eighty sex offenders were living safely in general population units. Defendants represented at the hearing that no sex offender presently at FCI Berlin, other than Hilario, has reported being assaulted there.  At the hearing, evidence was also presented that there are 12 general population units at FCI Berlin, and that if returned to general population, Hilario would not necessarily be returned to C-1 Unit.

<u>**DISCUSSION**</u>

I.  **Preliminary Injunction Standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

11

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 9 (1st Cir. 2012).  The party seeking the injunction bears the burden of proof.  See González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009).

## II.  **Likelihood of Success on the Merits**

Demonstrating a likelihood of success on the merits of the underlying claims in the lawsuit is a prerequisite to obtaining preliminary injunctive relief.  See Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) ("if the moving party cannot demonstrate that he is likely to succeed in his quest," preliminary injunctive relief is properly denied without further analysis).  Hilario's underlying claim is that the Defendants violated his Eighth Amendment rights by failing to protect him from a substantial risk of serious harm when they assigned him to a general population unit at the FCI Berlin on April 3, 2014, and again on April 14, 2014.  To show that he is likely to succeed on the merits of that claim, Hilario must demonstrate that the Defendants acted with "deliberate indifference" to a "substantial risk" that Hilario would be

subject to "serious harm" in general population.  Farmer v.
Brennan, 511 U.S. 825, 828 (1994) (citation omitted).  To
demonstrate deliberate indifference, Hilario must show that the
Defendants were aware of and disregarded an excessive risk to
his safety.  See id. at 843-44.  A prison official does not
violate the Eighth Amendment if he "respond[s] reasonably to the
risk, even if the harm ultimately was not averted."  Id. at 844.

In this instance, the testimony from both parties
demonstrated that both times Hilario was placed in general
population and reported a threat to his safety, he was placed in
SHU pending investigation of his allegations.  Although the
testimony at the hearing suggested that the investigations were
not as thorough, objective, or effective as they could have
been, the investigations were sufficient to allow the Court to
find that the Defendants responded reasonably to Hilario's
allegations under the circumstances presented to them.  Even if
the findings of the investigations were incorrect, or the
investigations were conducted in a negligent fashion, the
evidence at the hearing showed that neither Hilario's
allegations of threats, nor the potential risk of harm to
Hilario in general population, were disregarded by the
Defendants.  Hilario thus failed to meet his burden to
demonstrate that Defendants acted with deliberate indifference.

Accordingly, Hilario did not demonstrate that he is likely to succeed on the merits of the underlying claims in this action.

### III. __Irreparable Harm__

Even if Hilario were able to demonstrate that he was likely to succeed on the merits of his underlying claims, he has failed to demonstrate that he will be subject to irreparable harm absent an injunction.  Demonstration of irreparable harm in the absence of an injunction is required to obtain preliminary injunctive relief.  See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (citing 11A Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." (internal quotation marks and citation omitted))).  To demonstrate irreparable harm, the plaintiff must state facts to show more than speculation that he might suffer harm in the future if the court fails to issue the requested injunction.  See Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6-7 (1st Cir. 1991) ("'[s]peculative injury does not constitute a showing of irreparable harm'" (citation omitted)).

Hilario contends that, as a sex offender, and as someone who, since reporting the threats that form the basis of this action, is likely to be labelled a "snitch," his life will be in danger if he is returned to general population.  In support of this assertion, Hilario claims that during each of his two brief stays in C-1 Unit in April 2014, he was threatened and assaulted by other inmates because he is a sex offender.  The Defendants counter that the investigations found no verifiable threat to Hilario's safety.

The burden to demonstrate that irreparable harm does exist, however, is Hilario's, and he failed to meet it.  As the Court stated on the record at the August 11 hearing, Hilario has convinced the Court that he is sincerely afraid for his safety in a prison setting if he is not placed into protective custody. However, Hilario failed to present credible evidence at the hearing that he would, in fact, be in imminent danger of irreparable harm if the May 7 Order were rescinded.  Hilario's accounts of threats and assaults, both at the hearing and at FCI Berlin, have been inconsistent, at best.  The only other evidence of assault was a red mark on Hilario's face, without swelling, that a nurse saw on the evening of April 14, 2014, but that neither Lt. Myers nor Lt. Hess, who each spoke at some length with Hilario that afternoon, received a report of an

assault, or saw any mark on Hilario's face, at that time.
Without more, the evidence of redness on Hilario's face is
insufficient to lend sufficient credence to Hilario's account of
events to allow the Court to find that irreparable harm to
Hilario will result if the Court rescinds the May 7 Order.

Even if the Court were to accept, for the sake of argument,
that Hilario was threatened and assaulted on April 3 and April
14, 2014, however, Hilario cannot demonstrate that, absent the
Court's maintaining the May 7 Order, he would be subject to
irreparable harm.  The evidence at the hearing showed, and
Hilario did not deny, that Hilario need never return to general
population at FCI Berlin if he does not feel safe there,
regardless of the findings of any threat investigation.  Hilario
has the right to refuse to be housed in general population, and
to stay in SHU.  Although refusing general population placement
would result in disciplinary action and sanctions against
Hilario, no nonspeculative evidence was presented at the hearing
indicating that those sanctions would be so severe as to
constitute irreparable harm.

Although Hilario testified that while housed at SHU he was
threatened and assaulted by his cellmate there, he also
testified that FCI Berlin officials, upon Hilario's report of
that incident, immediately conducted a medical assessment, and

protected his safety by moving him to another cell.  Further, the evidence at the hearing demonstrated, first, that of the 86 sex offenders housed at FCI Berlin as of the date of the hearing, 80 were being housed safely in general population. Accordingly, Hilario has failed to meet his burden to demonstrate that he will suffer irreparable harm if the Court rescinds the May 7 Order.[7]

## IV.  Other Preliminary Injunction Factors

The Court need not make any finding concerning the balance of hardships or whether an injunction here would further public

---

[7]The Defendants largely found Hilario's allegations to be unverified because Hilario's statements concerning who had threatened him, and whether he had been assaulted, were inconsistent.  To determine whether Hilario's allegations could be verified, Lt. Myers and Brown watched video feed for April 14, 2014, that did not show the inside of Hilario's cell, where Hilario alleged the assault occurred, and, in Brown's case, did not include 15 minutes of video feed during which an assault could have occurred.  Further, Brown's primary investigative tool appears to have been asking the inmates Hilario had accused whether they had threatened or assaulted Hilario, and whether they had any reason to believe Hilario would not be safe in general population.  Brown, for purposes of his investigation, accepted those inmates' denials of wrongdoing and assurances that they had no problem with Hilario.  Brown relied on those statements, despite the fact that he believes inmates tell him the truth less than ten percent of the time when he asks them about their alleged wrongdoing, in recommending Hilario be returned to general population.  The Court notes that, while Plaintiff failed to carry his burden in this instance, the efforts of the Defendants to determine the validity of an alleged threat or assault on an inmate, at least as presented at the August 11 hearing, appear to lack objectivity, thoroughness, effectiveness, or the delicacy that may be required to get to the truth in such circumstances.

interest, as Hilario has demonstrated neither likelihood of success on the merits of his complaint nor irreparable harm.

**V.   <u>Other Motions</u>**

At the August 11, 2014, hearing, the Court announced, on the record, how it was inclined to rule on a number of motions pending in this case, including Plaintiff's: "Motion to Order the Defendants to Stop Giving Code Violations" (doc. no. 22); "Motion to Request Summary Judgment at the Conclusion of this Bivens Claim" (doc. no. 24); "Motion to Request that the Court Order AUSA to Give Answers to Plaintiff's Constitutional Questions" (doc. no. 32); "Motion for Protective Custody Status" (doc. no. 41); and Defendants' "Motion to Dismiss" (doc. no. 37). The Court's statements concerning these motions were docketed as oral orders. The Court's intention was not to issue final orders on those matters but, as the Court stated specifically with regard to the Motion to Rescind (doc. no. 11), the Court intended to take those matters under advisement, and to review the evidence prior to issuing its Order. Accordingly, the Court now directs that the "Oral Orders" docketed on August 11, 2014, denying the motions docketed at numbers 22, 24, 32, 37, 41, and 42, be vacated. The Court's rulings on those motions are contained in this Order.

**VI.** <u>**Rulings on Other Motions**</u>

    A. <u>Plaintiff's "Motion to Request that this Court Order the Defendants to Stop Giving 'Code Violations'. . ." (Doc. No. 22)</u>

Hilario has asserted that on two occasions in June 2014, FCI Berlin officials who had not been made aware of the Court's May 7 Order, directed Hilario to return to general population, and then initiated disciplinary action against Hilario when he refused to do so.  At the August 11 hearing, Defendants admitted that the May 7 Order had not been effectively communicated to all relevant FCI Berlin officials.  However, the evidence at the hearing demonstrated that once approprreate officials were made aware of the May 7 Order, the disciplinary actions and sanctions imposed thereon were rescinded and/or expunged, and thus did not impact Hilario. Further, the Court finds that the failure to communicate its Order, while less than commendable, did not constitute willful disregard of a Court order sufficient to warrant a contempt finding, as requested in Plaintiff's motion.

In his Motion, Hilario also requested an order directing that he be transferred to a different facility that is safer for sex offenders.  For the reasons explained above, the Court finds that no such Order is warranted.  Accordingly, Hilario's motion (doc. no. 22) is denied.

B.    <u>Hilario's "Motion to Request Summary Judgment, at the</u>
      <u>Conclusion of this Bivens Claim Herein" (Doc. No. 24)</u>

While titled as a motion for summary judgment, Hilario's

Motion (doc. no. 24) largely reiterates Hilario's request for

injunctive relief, and also adds a request for compensatory and

punitive damages.  To the extent the Motion reiterates Hilario's

claim for injunctive relief, it is denied for the reasons stated

in this Order.  If Hilario seeks to add claims for damages to

this action, he must do so by properly filing a motion to amend

his complaint seeking such relief against appropriate

defendants.  Accordingly, the Motion (doc. no. 24) is denied

without prejudice to Hilario filing a motion for summary

judgment or a motion to amend his complaint.

C.    <u>Hilario's "Motion to Request that this Court Orders .</u>
      <u>. . [an] "Answer" to Plaintiff's Constitutional</u>
      <u>Question(s) Herein" (Doc. No. 32)</u>

The Court cannot find any cognizable request for relief in

Hilario's Motion.  Further, nothing in the Motion appears

relevant to any issue in this case.  Accordingly, the Motion

(doc. no. 32) is denied.

D.    <u>Hilario's "Motion to Request that this Court Order the</u>
      <u>Defendants to Give the Plaintiff Protective Custody</u>
      <u>Status . . ." (Doc. No. 41)</u>

Hilario asserts that when he submitted an administrative

grievance requesting protective custody status, FCI Berlin

officials informally resolved the grievance.  Hilario believed
the informal resolution included Defendants' promise to give
Plaintiff protective custody status.  Hilario seeks an Order
directing that the promise be enforced.  The Court finds that no
such promise existed, and thus there is nothing to enforce.
Further, for the reasons explained in this Order and during the
August 11 hearing, the Court finds that directing the Defendants
to place Hilario in protective custody is inappropriate.
Accordingly, the Motion (doc. no. 41) is denied.

E.    Defendants' "Motion to Dismiss" ((Doc. No 37)

Defendants have filed a motion to dismiss asserting that
Hilario has failed to exhaust his administrative remedies in
this matter.  Because the motion requires consideration of
evidence outside of the pleadings, it is not properly considered
as a motion to dismiss, but instead, as a motion for summary
judgment.  Accordingly, the Motion (doc. no. 37) is denied
without prejudice to Defendants' refiling the motion as one for
summary judgment.

**VII. Notice of Interlocutory Appeal**

On August 15, 2014, Hilario filed a document in this matter
entitled "Notice of Appeal" (Docket No. 45-1).  In general, the
District Court loses jurisdiction in a case once a party files a

notice of appeal, as such a filing ordinarily transfers jurisdiction over the case, or at least of matters in the case related to the appeal, to the appellate court.  However, certain exceptions to that rule exist.

> A district court can proceed, notwithstanding the
> filing of an appeal, if the notice of appeal is
> defective in some substantial and easily discernible
> way (if, for example, it is based on an unappealable
> order) or if it otherwise constitutes a transparently
> frivolous attempt to impede the progress of the case.

United States v. Brooks, 145 F.3d 446, 456 (1st Cir. 1998). "Where the order in question is manifestly unappealable, the court of appeals never gains jurisdiction of it and, consequently, the district court never loses jurisdiction of it." United States v. Ferris, 751 F.2d 436, 440 (1st Cir. 1984) (citing 9 Moore's Federal Practice ¶ 203.11, 3-51-52).  "In such a case, the district court may ignore the appeal and proceed with the case, '[o]therwise, a litigant could temporarily deprive a court of jurisdiction at any and every critical juncture.'"  Id. (internal citation omitted).

Here, it appears that Hilario seeks to appeal the "Oral Orders" which, as the Court now clarifies, this Court did not intend to issue as final Orders.  Because the Court has vacated the "Oral Orders" as clerical docketing errors, Hilario's "Notice of Appeal" does not pertain to an appealable Order in this matter.  Accordingly, this Court finds that it maintains

jurisdiction over the issues before the Court related to

Hilario's custody, security status, and housing placement.

**CONCLUSION**

For the foregoing reasons, and for the reasons stated on

the record at the August 11, 2014, hearing in this matter:

1.   Defendants' "Motion to Rescind" (doc. no. 11) the
Court' May 7, 2011, Order (doc. no. 4) granting certain
injunctive relief is GRANTED and the order is vacated to
the extent it directed Defendants not to place Hilario in
general population and to house him, to the extent
practicable, where he will not be likely to suffer harm.

2.   Plaintiff's "Motion to Request that this Court Order
the Defendants to Stop Giving 'Code Violations' .   .   ."
(doc. no. 22) is DENIED.

3.   Plaintiff's "Motion to Request Summary Judgment, at
the Conclusion of this Bivens Claim Herein" (doc. no.  24)
is DENIED.

4.   Plaintiff's "Motion to Request that this Court Orders
.  .  . [an] 'Answer' to Plaintiff's Constitutional Questions
Herein" (doc. no. 32) is DENIED.

5.   Defendants' "Motion to Dismiss" (doc. no. 37) is
DENIED without prejudice to Defendants' refiling the motion
as one for summary judgment.

6.   Plaintiff's "Motion to Request that this Court Order
the Defendants to Give the Plaintiff Protective Custody
Status .  .  ." (doc. no. 41) is DENIED.

7.   The Clerk's Office is directed to correct the docket
in this matter to indicate that the Oral Orders docketed on
August 11, 2014, were docketed in error, and to clarify

that those Orders were in fact taken under advisement on
that date.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

September 3, 2014

cc:  Jose Miguel Hilario, pro se
     T. David Plourde, Esq.